Filed 4/8/21  P. v. Watson CA4/1
# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D076475 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD278660-02) |
| ANTHONY WATSON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Michael S. Groch, Judge.  Affirmed.

Charles R. Khoury, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steven T. Oetting and Daniel J. Hilton, Deputy Attorneys General, for Plaintiff and Respondent.

# I.

# INTRODUCTION

A jury found Anthony Watson guilty of two counts of robbery (Pen. Code, § 211,[1] counts 1 & 2) and two counts of petty theft (§ 484, counts 3 & 4). The jury also found Watson's brother, codefendant Brandon Smith, guilty of two counts of robbery (counts 1 & 2) and one count of petty theft (count 4).[2] Watson admitted having suffered two strike priors (§§ 667, subds. (b)–(i), 668, 1170.12), a serious felony prior (§§ 667, subd. (a)(1), 668, 1192.7, subd. (c)), and a prison prior (§§ 667.5, subd. (b), 668).

At sentencing, the trial court struck one of the strike priors, and sentenced Watson to 13 years in prison, consisting of the middle term of three years for count 1, doubled to six years because of the strike prior, two years for count 2, calculated at one-third the midterm, and five years for the serious felony prior.[3] The court stayed execution of the sentence for the prison prior.

On appeal, Watson claims that the trial court erred in instructing the jury concerning the natural and probable consequences doctrine, that the prosecutor committed prosecutorial error in arguing to the jury regarding that doctrine, and that his trial counsel provided ineffective assistance in failing to object to these errors. Watson also argues that the court erred in failing to provide the jury with a unanimity instruction with respect to each robbery count (counts 1 & 2). In addition, Watson contends that the evidence is insufficient to support the jury's guilty verdicts on the robbery counts.

---

[1]     Unless otherwise specified, all subsequent statutory references are to the Penal Code.

[2]     The jury found Smith not guilty of the petty theft charged in count 3.

[3]     As to the misdemeanor theft counts (counts 3 & 4), the trial court stated, "probation is denied. . . .  [C]redit for time served."

With respect to his sentence, Watson requests that we remand the matter to permit the trial court to consider exercising its discretion to strike the serious felony enhancement, and that we strike all of the fines and fees that the court imposed at sentencing as violative of his constitutional rights.

We affirm the judgment.[4]

## II.

## FACTUAL BACKGROUND

### A. *GameStop Robbery* (*Count 1*)

One day in August 2018, Watson and Smith were at a store that sells video games called GameStop.[5] One of the men told the store's assistant manager, J.F., that he wanted to purchase a video game. After J.F. retrieved the game from behind the counter, J.F. opened the cash register to complete the sale. Watson and Smith immediately reached over the register and began to grab money from it.

While taking the money with one hand, Watson grabbed J.F.'s wrist with his other hand and "pinned" it against the side of the cash register. J.F. grabbed Watson's hand to try and stop him. After a brief struggle, Watson broke free from J.F.'s grasp and followed Smith out of the store with money that they had stolen. J.F. sustained a minor injury to his hand during the incident.

---

[4]     Watson also filed a petition for habeas corpus in which he contends that his trial counsel provided ineffective assistance in failing to object to the trial court's jury instruction pertaining to the natural and probable consequences doctrine and to the prosecutor's closing argument pertaining to the application of that doctrine. By way of a separate order filed today, we summarily deny Waston's petition.

[5]     In the record, the store is referred to as "Game Stop"; we use the proper name of the business, "GameStop."

3

B. *Yum Yum Yo Robbery* (*Count 2*)

On a different day in August 2018, Watson and Smith walked into a sandwich shop called Yum Yum Yo. Smith ordered a sandwich and handed the shop owner, K.D., a five dollar bill. When K.D. opened the register, both men reached over the counter and started to grab money. K.D. was scared. K.D. attempted to close the drawer to the register, but was unable to immediately do so because Watson and Smith's hands were inside the drawer. The men fled the shop with money from the register.

C. *AM/PM Theft* (*Count 3*)

One morning in September 2018, Watson and Smith entered an AM/PM store. After telling the clerk that he wanted to purchase an item, one of the men handed the clerk some money. When the clerk opened the cash register, one of the men[6] reached over the counter and grabbed money from the register. Both men then left the store.[7]

D. *Appletree Market Theft* (*Count 4*)

One afternoon in July 2018, Watson and Smith were checking out at the Appletree Market. After the cashier opened the register, both men

---

[6] It is unclear from the clerk's trial testimony whether this was the same man who told her that he wanted to make a purchase.

[7] At trial, the clerk testified that she could not identify the men involved in the incident. However, the People offered in evidence an excerpt of the clerk's preliminary hearing testimony, during which she identified Watson and Smith as the persons who "took . . . money" from her during the incident. In addition, the jury was shown a surveillance video from the incident and still images taken from the video. A police officer who had supervised Watson and Smith identified the men as the individuals depicted in two of the photos taken from the surveillance video. The exhibits containing the surveillance video and images from the AM/PM store robbery have not been transmitted to this court.

reached over the counter and started grabbing money. They then fled the store.

## III.

## DISCUSSION

A. *The trial court did not err in instructing the jury concerning the natural and probable consequences doctrine and the prosecutor did not commit prosecutorial error in arguing to the jury regarding that doctrine*

Watson claims that the trial court erred in instructing the jury pursuant to CALCRIM No. 403 concerning the natural and probable consequences doctrine and that the prosecutor reinforced that error during her closing argument. Specifically, Watson appears to contend that the court's jury instruction and the prosecutor's argument could have led the jury to conclude that it could find Watson and Smith guilty of robbery as a natural and probable consequence of committing petty theft, even if neither Watson nor Smith committed a robbery.[8]

We review Watson's claim de novo.[9] (See *People v. Mitchell* (2019) 7 Cal.5th 561, 579 ["An appellate court reviews the wording of a jury

---

[8] The precise contours of Watson's argument are not entirely clear from his brief. However, we understand his argument to be as summarized in the text. Watson argues, "The prosecutor's purpose in wanting [CALCRIM No.] 403 to be given to the jury along with her argument applying it to *both* defendants was to be able to get convictions of a violent offense, robbery, on the theory that it was a reasonably foreseeable consequence of petty theft, an offense requiring no proof of violent conduct." In addition, in presenting his unanimity argument, see part III.C., *post*, Watson argues: "The entire gist of this contention can be summed up as follows: CALCRIM [No.] 403 plus the prosecution argument represented a legally invalid theory that both defendants could be convicted of robbery as a foreseeable natural and probable consequence of committing a petty theft."

[9] The People contend that Watson forfeited his claim by failing to object in the trial court to either the court's jury instruction or the prosecutor's

instruction de novo and assesses whether the instruction accurately states the law"]; *People v. Uribe* (2011) 199 Cal.App.4th 836, 860 [a claim of prosecutorial error is reviewed independently].)

1. *Factual and procedural background*

    a. *The jury instruction on the natural and probable consequences doctrine*

During the trial, while the trial court was instructing the jury, the court excused the jury from the courtroom for a recess. During the recess, the following colloquy occurred:

> "The court: [W]e're outside the presence of the jury. I stopped at [CALCRIM] instruction [number] 403 because I'm concerned about confusion with the jury. [¶] [CALCRIM No.] 403 reads: Before you may decide whether the defendant is guilty of robbery, you must decide that he is guilty of petty theft, and then goes on, when [*sic*] the natural and probable consequences discussion.
>
> "That's true, in terms of aiding and abetting. It's not true in terms of straight direct liability. So perhaps it should be modified to say on an aiding and abetting theory, before you decide whether a defendant is guilty of robbery.
>
> "[The prosecutor:] Your Honor, my intention was to argue this as a -- as it relates to a conspiracy theory. And I was precluded from -- my request for conspiracy instructions, which I believe the evidence supports, was denied. [¶] But that is what I believe this instruction really related to, because they were both direct perpetrators in petty theft, in certain incidents. Or the two incidents for the alleged robbery. They were both direct perpetrators in committing the petty theft and then one committed a robbery, so I need -- I still think the conspiracy instructions apply.
>
> "The court: Well, I understand your disagreement with me over conspiracy, and we've addressed that. The question is

---

argument. Notwithstanding Watson's possible forfeiture, we exercise our discretion to consider the substance of Watson's claim.

6

as it applies to aiding and abetting, whether this instruction [CACLCRIM No.] 403 should be given or not, or modified.

"[The prosecutor:] I don't believe that it should be modified.

"The court: Either counsel want to weigh in?

"[Watson's counsel:] No, thank you, Your Honor. Submitted.

"[Smith's counsel:] Submitted, Your Honor.

"The court: [CALCRIM No.] 403 is in the aiding and abetting section of the instructions, not the conspiracy instructions. It is a correct statement of the law, but one could read the instruction not knowing about how chapters and CALCRIM work, and think they have to make this finding before finding the defendants guilty of robbery on a direct liability theory.

"If nobody is concerned about that than me, that's fine. Sounds like I'm standing alone, so I'll leave the instructions as given."

After the recess, the jury returned, and the trial court continued instructing the jury. The trial court instructed the jury concerning the natural and probable consequences doctrine pursuant to CALCRIM No. 403 as follows:

"Before you may decide whether a defendant is guilty of robbery, you must decide whether he is guilty of petty theft. To prove that the defendant is guilty of robbery, the People must prove that, one, the defendant is guilty of petty theft.

"Two, during the commission of petty theft, a co-participant in that petty theft committed the crime of robbery.

"And three, under all of the circumstances, a reasonable person in the defendant's position would have known that the commission of robbery was a natural and probable consequence of the commission of the petty theft.

7

"A co-participant in a crime is a perpetrator or anyone who aided and abetted the perpetrator. It does not include a victim or innocent bystander.

"A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence.

"To decide whether the crime of robbery was committed, please refer to the separate instructions that I have given you on that crime."

Shortly thereafter, the trial court instructed the jury pursuant to CALCRIM Nos. 1600 and 1800 on the elements of robbery and petty theft, respectively.

### b. *The prosecutor's closing argument*

During her closing argument, while discussing the incident at the GameStop store, the prosecutor argued that Watson was guilty of robbery as a direct perpetrator. The prosecutor argued that Watson "grabbed [the victim's] wrist[;] that's force right there." The prosecutor further argued that Watson "us[ed] force to resist [the victim's] efforts." The prosecutor then argued that these actions demonstrated that Watson committed a robbery rather than a petty theft, arguing:

"When you commit a petty theft, and you don't use any force, and you don't have any contact, and you just take something and you leave, that's a crime. That's one type crime, but when you stand over someone in their face and you grab them and you touch them and you get into their space and you cause them to have an injury where they have to ice their hand. And you have a struggle, and this person who has never been through that, anything like that in their life, whose life now has been changed, that is a different type of crime. It is a robbery."

8

After arguing that Watson was guilty of the robbery of the GameStop store as a direct perpetrator, the prosecutor argued that Smith was guilty of that robbery as an aider an abettor pursuant to the natural and probable consequences doctrine, as follows:

> "What about Mr. Smith? Now, you may be saying to yourself, well, yes, Mr. Smith was there. He committed a theft, he was there at the register, but he's not the one that pinned [the victim's] hand. He's not the one that struggled. Why is he guilty of a robbery? I submit to you that Mr. Smith is guilty of a robbery, under the natural and probable consequences theory. This is an offshoot of the aiding and abetting theory that we've already talked about.

> "To find Mr. Smith guilty, under a natural and probable consequences theory, you need to find the following: That Mr. Smith committed petty theft. He's guilty of that. That during the commission of that petty theft, Mr. Watson, his co-participant in the theft, committed a robbery. And that under all of the circumstances, a reasonable person in Smith's position would have known that the commission of a robbery was a natural and probable consequence of the commission of a petty theft. And what that really means is was it reasonably foreseeable considering all of the circumstances?

> "So -- and this is not, you know, we're not talking about Smith himself. We're talking about you. We're talking about objective, reasonable people objectively. Would a reasonable person, doing what Smith was doing, in all of those circumstances know, was it reasonably foreseeable that there may be some force that had to be used in order to either get that property or to resist the efforts of the victim? Absolutely. Again, this is a series of crimes. They committed all these crimes together.

> "By the time they committed the [GameStop] crime, they already committed the Yum Yum Yo crime two weeks earlier. And another incident as well, the AM/PM crime was before that as well, but the Yum Yum Yo incident itself, that's one where force was used by both of them.

They were both pushing, the victim was trying to close the cash register.

"You know, absolutely he would have known, a reasonable person would have known that, again, you're not in a situation where you're stealing something off of a shelf when no one is looking, and walking out of the store. You are making a plan to confront the cashier with his hands, standing at the register. You are making a plan to go into that person's personal space, aggressively reaching over the counter, overcoming their will to resist and getting that money.

"Now, you may not intend to hurt them, to use any force at all. You may hope that if all goes well, we don't even have to touch these people, or that they don't touch us. But you go in there knowing that it is reasonably foreseeable that when you reach into someone's personal space and grab the money that belongs to them, there may be some use of force. You may have to push that person out of the way. You may have to struggle with them if they resist. You may have [to] pull that drawer open if they try to push it close[d]. *So under the natural and probable consequences theory, you can find both of the defendants guilty of robbery*." (Italics added.)

2. *Governing law*

a. *The natural and probable consequences doctrine*

"Aider-abettor liability exists when a person who does not directly commit a crime assists the direct perpetrator by aid or encouragement, with knowledge of the perpetrator's criminal intent and with the intent to help him carry out the offense." (*People v. Miranda* (2011) 192 Cal.App.4th 398, 407.) "Under the natural and probable consequences doctrine, an aider and abettor is guilty of not only the offense he intended to facilitate or encourage, but also of any reasonably foreseeable offense committed by the actual perpetrator. The defendant's knowledge that an act which is criminal was intended, and his action taken with the intent that the act be encouraged or

10

facilitated, are sufficient to impose liability on him for any reasonably foreseeable offense committed as a consequence by the perpetrator." (*Id.* at pp. 407–408.)

### b. *The law governing jury instructions*

"When considering a claim of instructional error, we view the challenged instruction in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner." (*People v. Houston* (2012) 54 Cal.4th 1186, 1229.) In that context, we must then "determine whether it is reasonably likely the jurors understood the instruction[s] as [defendant] suggests. [Citation.] In making that determination, we must consider several factors including the language of the instruction in question [citation], the record of the trial [citation], and the arguments of counsel." (*People v. Nem* (2003) 114 Cal.App.4th 160, 165.)

### c. *Prosecutorial error*

"The use of deceptive or reprehensible methods to persuade the jury constitutes [prosecutorial] misconduct." (*People v. Sanchez* (2016) 63 Cal.4th 411, 475.) In addition, "it is improper for [a] prosecutor to misstate the law." (*People v. Marshall* (1996) 13 Cal.4th 799, 831 (*Marshall*).) "A defendant asserting prosecutorial misconduct must further establish a reasonable likelihood the jury construed the remarks in an objectionable fashion." (*People v. Duff* (2014) 58 Cal.4th 527, 568 (*Duff*).)

### 3. *Application*

With respect to Watson's jury instruction claim, CALCRIM No. 403 is a correct statement of the law, and Watson does not identify any infirmity in the instruction. While the trial court expressed its concern that the jury might think that it had to find that the elements of CALCRIM No. 403 were

11

met before finding the defendants guilty under a *direct* liability theory,[10] that is an ambiguity that could have only made it more *difficult* for the jury to find the defendants guilty. Thus, any such ambiguity could not have possibly prejudiced either defendant. (See *People v. Lee* (1999) 20 Cal.4th 47, 52 ["Defendant may not complain on appeal about errors favorable to him"].)

However, the trial court never suggested that it was concerned that the jury might apply CALCRIM No. 403 to find the defendants guilty of robbery *without* finding that one of them committed a robbery, and Watson does not point to any language in the instruction that would permit such a result. On the contrary, the court expressly instructed the jury that in order to find a defendant guilty of robbery pursuant to the natural and probable consequences doctrine, the jury was required to find, among other elements that "a co-participant in that petty theft committed the crime of robbery." Thus, Watson's claim that the trial court erred in instructing the jury concerning the natural and probable consequences doctrine is without merit.

After quoting a portion of the prosecutor's argument that is quoted in part III.A.1.a, *ante*, pertaining to the GameStop Robbery, Watson claims that the prosecutor misstated the law by "telling the jury that by finding a petty theft had occurred, they could, as a natural and probable consequence, find both defendants guilty of robbery." As noted *ante*, we understand Watson to be arguing that the prosecutor misstated the law by arguing that Watson and Smith could *both* be guilty of robbery pursuant to the natural and probable

---

10      Specifically, as noted in part III.A.1.a, *ante*, after referring to CALCRIM No. 403 outlining the elements of guilt under the natural and probable consequences doctrine, the trial court stated that the jury might think that "they have to make this finding before finding the defendants guilty of robbery on a direct liability theory."

12

consequences doctrine, even if *neither* committed a robbery, as long as they had each committed a petty theft.[11]

This argument fails because, when the prosecutor's argument is considered in full, it is clear that the prosecutor was arguing that Watson was guilty of the GameStop Robbery as a direct perpetrator, and that Smith was guilty of the GameStop Robbery as an aider and abettor pursuant to the natural and probable consequences doctrine. Stated differently, there is no "reasonable likelihood" that the jury construed the prosecutor to be arguing that Watson was guilty of the GameStop Robbery pursuant to the natural and probable consequences theory. (*Duff, supra,* 58 Cal.4th at p. 568.)

In addition, the prosecutor never stated that either defendant could be found guilty of a robbery without at least one of the coparticipants having committed a robbery, and the other elements of the natural and probable consequences doctrine being met. On the contrary, in arguing Smith's guilt pursuant to the natural and probable consequences doctrine for the GameStop Robbery, the prosecutor echoed CALCRIM No. 403, and told the jury that it was required to find that "during the commission of that petty theft, Mr. Watson, his co-participant in the theft, committed a robbery." In short, the prosecutor did not commit prosecutorial error by "misstat[ing] the law." (*Marshall*, *supra*, 13 Cal.4th at p. 831.)

B. *Defense counsel did not provide ineffective assistance in failing to object to the trial court's jury instruction and the prosecutor's argument concerning the natural and probable consequences doctrine*

Watson claims that his counsel provided ineffective assistance in failing to object to the trial court's giving CALCRIM No. 403 and the prosecutor's

---

[11] Watson argues, "In argument to the jury the prosecutor included *both defendants* into the ambit of guilt of robbery due to foreseeability of a petty theft."

closing argument pertaining to the natural and probable consequences doctrine as applied to the GameStop Robbery.

  1. *Governing law*

  To establish a claim of ineffective assistance of counsel, a defendant must show that counsel's performance was deficient in that it "fell below an objective standard of reasonableness," evaluated "under prevailing professional norms." (*Strickland v. Washington* (1984) 466 U.S. 668, 688 (*Strickland*); accord *People v. Ledesma* (1987) 43 Cal.3d 171, 216.) The defendant must also show that it is reasonably probable that a more favorable result would have been reached absent counsel's deficient performance. (*Strickland*, at p. 694.)

  "When examining an ineffective assistance claim, a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.) Thus, "[w]hen the record on direct appeal sheds no light on why counsel failed to act in the manner challenged, defendant must show that there was ' " 'no conceivable tactical purpose' " for counsel's act or omission.' " (*People v. Centeno* (2014) 60 Cal.4th 659, 675 (*Centeno*).)

  2. *Application*

  Our determination in part III.A.3, *ante*, that CALCRIM No. 403 properly states the law and that any ambiguity in its application to this case could have only favored Watson makes clear that defense counsel was not ineffective in failing to object to the instruction. Defense counsel could have reasonably determined that it was not in Watson's interest to raise an objection that could have only harmed his client. Thus, Watson cannot

establish the lack of any " ' " 'conceivable tactical purpose' " ' " (*Centeno*, *supra*, 60 Cal.4th at p. 675) for failing to object to the instruction.

In addition, our conclusion that the prosecutor did not commit error during her closing argument defeats Watson's claim of ineffective assistance premised on defense counsel's failure to object to the prosecutor's argument. (See, e.g., *People v. Bradley* (2012) 208 Cal.App.4th 64, 90 ["Failure to raise a meritless objection is not ineffective assistance of counsel."].)

Accordingly, we conclude that defense counsel did not provide ineffective assistance in failing to object to the trial court's jury instruction and the prosecutor's argument concerning the natural and probable consequences doctrine.

C. *The trial court was not required to provide a unanimity jury instruction with respect to either robbery count (counts 1 & 2)*

Watson claims that the trial court was required to provide the jury with a unanimity instruction with respect to each of the robbery charges (counts 1 & 2).

1. *Governing law*

In *People v. Covarrubias* (2016) 1 Cal.5th 838, 877–878, the California Supreme Court provided an overview of the aspects of a criminal case for which jury unanimity, and a unanimity instruction, are, and *are not*, required:

> "In a criminal case, "the jury must agree unanimously the defendant is guilty of a *specific* crime. [Citation.] Therefore, cases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act." [Citation.] Yet 'where the evidence shows only a single discrete crime but leaves room for disagreement as to exactly how that crime was committed or what the defendant's precise role was, the jury need not

15

unanimously agree on the basis or, *as the cases often put it, the 'theory' whereby the defendant is guilty*.' [Citation.] 'In deciding whether to give the instruction, the trial court must ask whether (1) there is a risk the jury may divide on two discrete crimes and not agree on any particular crime, or (2) the evidence merely presents the possibility the jury may divide, or be uncertain, as to the exact way the defendant is guilty of a single discrete crime. In the first situation, but not the second, it should give the unanimity instruction.' [Citation.]" (Second italics added.)

(See, e.g., *People v. Armstrong* (2019) 6 Cal.5th 735, 794 [" 'the jury need not unanimously agree on the theory under which the defendant is guilty' "].)

Consistent with the rule that a jury need not unanimously agree as to the *theory* under which a defendant is guilty, the California Supreme Court has repeatedly held that jurors need *not* unanimously agree as to whether a defendant is guilty as an aider and abettor or as a direct perpetrator. (See *People v. Smith* (2014) 60 Cal.4th 603, 618 (*Smith*); *People v. Wilson* (2008) 44 Cal.4th 758, 801 ["the jury need not decide unanimously whether a defendant was a direct perpetrator or an aider and abettor, so long as it is unanimous that he was one or the other"]; *People v. Jenkins* (2000) 22 Cal.4th 900, 1026 [same].) As the *Smith* court explained:

> " ' "[A]s long as each juror is convinced beyond a reasonable doubt that defendant is guilty of murder as that offense is defined by statute, it need not decide unanimously by which theory he is guilty. [Citations.] More specifically, the jury need not decide unanimously whether defendant was guilty as the aider and abettor or as the direct perpetrator. . . . [¶] . . . [¶] Not only is there no unanimity requirement as to the theory of guilt, the individual jurors themselves need not choose among the theories, so long as each is convinced of guilt. Sometimes . . . the jury simply cannot decide beyond a reasonable doubt exactly who did what. There may be a reasonable doubt that the defendant was the direct perpetrator, and a similar doubt that he was the aider and abettor, but no

16

such doubt that he was one or the other." [Citations.] Defendant contends that different facts would support aiding and abetting liability and liability as a direct perpetrator, but, as we have explained, the jury need not unanimously agree "on the precise factual details of how a killing under one or the other theory occurred in order to convict defendant of first degree murder." [Citation.] Naturally, in order to return a guilty verdict, the jury must agree unanimously that each element of the charged crime has been proved, but the factors that establish aiding and abetting liability are not included as elements of the crime of murder. [Citations.]' " (*Smith*, *supra*, at p. 618.)

2. *Application*

Watson contends that the trial court was required to provide a unanimity instruction to the jury because, without a such an instruction, "the jury could rely on two different theories to convict appellant Watson of the two counts of robbery." Specifically, with respect to each robbery, Watson contends that some jurors might have found him guilty as an aider and abettor of a petty theft that naturally and probably resulted in the robbery, while other jurors might have found him guilty as the direct perpetrator of the robbery.

The unanimity that Watson suggests was required is, in fact, *not* required under California law. The California Supreme Court case law discussed above makes clear that the jury was *not* required to unanimously agree whether Watson was guilty of the robberies charged in counts 1 and 2 as the direct perpetrator or as an aider and abettor (pursuant to the natural and probable consequences doctrine). (See, e.g., *Smith*, *supra*, 60 Cal.4th at p. 618 ["the jury need not decide unanimously whether defendant was guilty as the aider and abettor or as the direct perpetrator"].)

17

Accordingly, we conclude that the trial court was not required to provide the jury with a unanimity instruction with respect to either robbery count (counts 1 & 2).[12]

D. *There is substantial evidence in the record of Watson's use of force to support the jury's verdicts finding him guilty of robbery in counts 1 and 2*

Watson claims that there is insufficient evidence of his use of force or fear to sustain the jury's verdicts finding him guilty of robbery in either count 1 (GameStop Robbery) or count 2 (Yum Yum Yo Robbery).

1. *Governing law*

a. *Sufficiency of the evidence*

In determining whether there is sufficient evidence to support a jury's guilty verdict, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319.) "[T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.)

b. *Substantive law*

"Robbery is the 'felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will,

_____

[12] In light of our conclusion that the trial court was not required to provide a unanimity jury instruction for either count, we need not consider Watson's contention that *Ramos v. Louisiana* (2020) ___ U.S. ___ [140 S.Ct. 1390] makes clear that the *Chapman v. California* (1967) 386 U.S. 18 standard of prejudice applies in determining whether a trial court's error in failing to provide a unanimity instruction is prejudicial.

accomplished by means of force or fear.' " (§ 211.) It is the use of force or fear which distinguishes robbery from grand theft from the person." (*People v. Mungia* (1991) 234 Cal.App.3d 1703, 1707.)

In *People v. Montalvo* (2019) 36 Cal.App.5th 597, the court summarized the law governing the amount of force necessary to commit a robbery under California law as follows:

> " '[T]he "force" required for robbery is not necessarily synonymous with a physical corporeal assault.' [Citation.] However, '[t]he law does require that the perpetrator exert some quantum of force in excess of that "necessary to accomplish the mere seizing of the property." ' [Citation.] '[T]he force need not be great . . . .' [Citation.] 'An accepted articulation of the rule is that " '[a]ll the force that is required to make the offense a robbery is such force as is actually sufficient to overcome the victim's resistance . . . .' " ' " (*Id.* at p. 618.)

In *People v Garcia* (1996) 45 Cal.App.4th 1242, 1246 (*Garcia*), the court discussed the force necessary to commit a robbery in the context of a defendant's efforts to take money from a store's cash register. The *Garcia* court described the evidence as to the amount of force that the defendant used to commit the offense in that case as follows:

> "The evidence was defendant approached the cashier while the register drawer was open and gave her a slight push, 'like a tap,' on her shoulder with his shoulder. Fearful defendant might be armed, the cashier moved away. Defendant then reached into the open register, grabbed the money and escaped. The cashier was not injured." (*Garcia, supra,* 45 Cal.App.4th at p. 1246.)

The *Garcia* court rejected the defendant's claim that he was entitled to a lesser included offense instruction on theft, reasoning in part that the force that he applied to the cashier did not exceed that necessary to accomplish the seizing of the property:

19

"Defendant concedes he touched the cashier in the course of taking the money. He argues, however, the force required for robbery is more than an incidental touching. A pickpocket touches the victim in extracting a wallet from his pocket, but this does not make the pickpocket a robber. The force required for robbery is more than 'just the quantum of force which is necessary to accomplish the mere seizing of the property.' [Citation.] In the present case, however, the touching was more than incidental and was not merely the force necessary to seize the money. The defendant did not simply brush against the cashier as he grabbed for the money. He intentionally pushed against her to move her out of the way so he could reach into the register." (*Garcia*, *supra*, 45 Cal.App.4th at p. 1246.)

A robbery can also be committed when force or fear is used "to prevent [a] person from resisting" the taking of property. (*People v. Scott* (2009) 45 Cal.4th 743, 749 (*Scott*).) For example, the use of force to prevent a store employee from resisting efforts to regain property or to facilitate the defendant's escape, is sufficient to support a robbery conviction. (*People v. Estes* (1983) 147 Cal.App.3d 23, 28 (*Estes*).)

2. *Application*

a. *Count 1 – GameStop Robbery*

J.F. testified that, while attempting to take money from the store's cash register, Watson "pinned . . . [J.F.'s] wrist to the register." When asked to elaborate, J.F. stated:

"So he grabbed my wrist -- so with my right-hand side, my right hand was pinned by his, I believe it was his left hand, which between the index and thumb was around my wrists. That then pinned it to where normally it sits on the side of the register drawer that I usually place it on.

"And in the process, the pressure downward forced the drawer to slide backwards a little bit and that caused my hand to be caught in the catch of the drawer itself, while

20

also being pinned down by the hand that was grasping my wrist."

J.F. stated that his recollection was that "it was a very clear grasp, like he grabbed my wrist, it wasn't just him moving my wrist out of the way."

J.F. also stated that, while Watson was taking money from the cash register, J.F. grabbed Watson's hand. When asked to describe this portion of the incident, the following colloquy occurred:

> "[The prosecutor:] Would you -- is it fair to say that there was some force that he used in trying to resist your efforts to grab him?
>
> "[J.F.:] Absolutely.
>
> "[The prosecutor:] Would it be fair to call this a struggle?
>
> "[J.F.:] Absolutely.
>
> "[The prosecutor]: Is there anything more to the struggle or was that sort of it, that you had grabbed his hand and he had tried to struggle to pull away from you?"
>
> "[J.F.] We struggled for a moment. At that point, my hand was free and I was trying to actively stop him. And I just -- I said 'sir' three times. And he struggled with me for a moment, and then finally broke free of me. At that point, his companion had already run out the front door and he went to follow."

After the incident, J.F. applied ice to his hand because it was hurting.

The People played surveillance video footage of the incident that corroborated J.F.'s testimony.

Based on J.F.'s testimony and the surveillance video footage of the incident, the jury could find that Watson applied force both to take the money and to resist J.F.'s efforts to prevent the taking. Specifically, the jury could find that in grabbing J.F.'s wrist and pinning to the register, Watson used a "quantum of force in excess of that 'necessary to accomplish the mere seizing

21

of the property.' " (*Montalvo, supra*, 36 Cal.App.5th at p. 618.) The evidence of the force applied in this case appears to have exceeded the force used by the defendant in *Garcia*, in which the court concluded that the amount of force used established a robbery rather than a theft. (*Garcia, supra*, 45 Cal.App.4th at p. 1246 [stating that no lesser included offense instruction on theft was required because there was no "factual question whether the defendant did or did not use force against the victim" in case in which evidence demonstrated that defendant used his shoulder to give store clerk a "slight push"].)

The jury could also find that Watson used force to prevent J.F. from effectively resisting Watson's taking of the property. Specifically, the jury could find that Watson used force to break free from J.F.'s attempt to detain him, further supporting the jury's guilty verdict. (See *Estes, supra*, 147 Cal.App.3d at p. 28 [robbery may be supported by evidence the defendant used force to "facilitate his escape"].)

Accordingly, we conclude that there is sufficient evidence of Watson's use of force to support the jury's verdict finding him guilty of count 1.

b. *Count 2 - Yum Yum Yo Robbery*

The jury could also reasonably find that Watson used forced to overcome K.D.'s resistance in perpetrating the Yum Yum Yo Robbery. K.D. initially described her efforts to close the cash register while Watson and Smith were attempting to grab money from the register as follows:

> "[The prosecutor:] Where were your hands at the time that
> [the defendants] reached over and grabbed money out of
> the register drawer?
>
> "[K.D.:] One hand, I was still holding the $5 bill. And
> I used my other hand to close the cash register.
>
> "[The prosecutor:] Were you trying to close the cash
> register while both of their hands were inside the drawer?

"[K.D.:]  Yes, both of their hands were on top of the drawers, and so the drawer popped open.

"[The prosecutor:]  All right. Why were you trying to close the drawer?

"[K.D.:]  They were trying to get the money and I was scared, so I tried to shut the drawer."  [¶] . . . [¶]

"[The prosecutor:]  Did you want them to take money out of your cash register?

"[K.D.:]  No."

Shortly thereafter, while the prosecutor was showing surveillance video of the incident at the Yum Yum Yo sandwich shop to the jury, the following colloquy occurred:

"[The prosecutor:]  Okay, at 8 seconds in, it looks like one of these individuals reaches into the cash register while both of your hands are inside the cash drawer; is that correct?

"[K.D.:]  Yes, both of my hands.

"[The prosecutor:]  Now, I want you to just watch this portion of the video and tell us what you are specifically doing and what they are specifically doing as I go through and play this.  And I stopped the video.

"[K.D.:]  Shutting the drawer.

"[The prosecutor:]  Okay. Were you successful in closing the drawer so they could not get the money?

"[K.D:]  By that time, they had already taken the money.

"[The prosecutor:]  Okay.  Did you see in the video some back and forth with the drawer going forward and back?

"[K.D.:]  Yes.

"[The prosecutor:]  Can you explain to us what was happening that was causing the drawer to go forward and back?

23

"[K.D.:]  I was trying to close it and the hands caused the drawer to open.  And then again, I tried to close it.

"[The prosecutor:]  Okay.  So is it fair to say that at least twice you tried to push the drawer closed unsuccessfully?

"[K.D.:]  Yes, because the hand stopped in there.

"[The prosecutor]:  Is it fair to say that when you tried to stop them, it didn't work? They kept on doing what they were doing?

"[K.D.:]  Yes."

The jury could reasonably find that the surveillance video footage shows the following:  Watson and Smith reaching over a cash register into the register's drawer; K.D. attempting to close the drawer; the men briefly struggling with K.D. to keep the drawer open while taking money; and K.D. closing the drawer as Watson and Smith remove their hands from the drawer.

From K.D.'s testimony, and the surveillance video footage of the incident, a reasonable juror could find that Watson used force to keep K.D. from closing the cash register.  The record thus contains evidence that Watson used force "to prevent [K.D.] from resisting" the taking of property. (*Scott*, *supra*, 45 Cal.4th at p. 743.)

Accordingly, we conclude that there is sufficient evidence of Watson's use of force to support the jury's verdict finding him guilty of count 2.[13]

E.   *Watson is not entitled to a remand to allow the trial court to exercise its sentencing discretion due to a change in the law*

Watson requests that we remand the matter to the trial court to consider whether to strike his serious felony prior (§ 667, subd. (a)) in light of

---

[13]   In light of our conclusion, we need not consider the People's argument that there is sufficient evidence of Watson's use of *fear* to support the jury's guilty verdict on count 2.

24

the enactment of Senate Bill No. 1393 (Stats. 2018, ch. 1013, §§ 1, 2 (Senate Bill 1393)), which provided trial courts with the authority to strike such enhancements.

1. *The change in the law*

On September 30, 2018, the Governor signed Senate Bill 1393, which, effective January 1, 2019, amended sections 667 and 1385 to give trial courts the discretion to dismiss five-year sentence enhancements under section 667, subdivision (a). (See Legis. Counsel's Dig., Sen. Bill No.1393 (2017–2018 Reg. Sess.) ["This bill would delete the restriction prohibiting a judge from striking a prior serious felony conviction in connection with imposition of [a] 5-year enhancement"].)

2. *Factual and procedural background*

The trial court sentenced Watson and Smith on August 29, 2019. In sentencing Smith, the trial court stated:

> "And then 5 years for the serious felony prior. I am mindful I have the discretion to strike that."

Immediately after sentencing Smith, the trial court sentenced Watson. The court stated in relevant part:

> "I impose sentence as follows: Count 1, the middle term, [six] years. That's [three] years, doubled, as a result of the strike, to [six] years.
>
> "Count 2, one-third the middle term, doubled, as a result of the strike, consecutive. That's an additional [two] years. [¶] [*Five*] *years on the serious felony prior*." (Italics added.)

3. *Application*

The trial court sentenced Watson in August 2019—almost nine months after the effective date of Senate Bill 1393. During Watson's sentencing hearing, while sentencing Watson's codefendant, the trial court expressly

25

stated that it was aware of its authority to strike a serious felony enhancement. Thus, we may presume that the trial court exercised its discretion under Senate Bill 1393 when it imposed the serious felony enhancement on Watson during the same hearing. (See *People v. Superior Court* (*Alvarez*) (1997) 14 Cal.4th 968, 977 [absent an affirmative showing of irrationality or arbitrariness "the trial court is presumed to have acted to achieve legitimate sentencing objectives"]; *People v. Mosley* (1997) 53 Cal.App.4th 489, 499 [where sentence was imposed 53 days after judicial decision authorizing the striking of a prior serious felony conviction, "[i]t can be presumed that the experienced trial judge was aware of his power to strike the prior serious felony conviction and intelligently chose not to do so"].)

Accordingly, we conclude that Watson is not entitled to a remand to permit the trial court to consider whether to strike the serious felony enhancement (§ 667, subd. (a)).

F. *Watson's claim that the trial court violated his constitutional rights in imposing various fines and fees is forfeited*

Citing *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*) and its progeny, Watson claims that the trial court violated his constitutional rights in imposing various fines and fees at sentencing.

Ordinarily, in order to preserve an objection to the imposition of a fine or fee at sentencing, a defendant must timely object. (See, e.g., *People v. Aguilar* (2015) 60 Cal.4th 862, 866–867 [defendant's failure to object at sentencing to certain fees on the basis of his inability to pay forfeited the challenge on appeal].)

As Watson concedes on appeal,[14] he never raised any objection at sentencing to the trial court's imposition of the fines and fees, and he provides no argument as to why the forfeiture doctrine does not apply to his claim.[15] Accordingly, we conclude that Watson has forfeited his claim that the trial court violated his constitutional rights in imposing various fines and fees at sentencing.[16]

---

[14] Watson states, "Defense counsel did not object when the judge said he was going to sentence . . . on the basis of the fines and assessments stated in the probation report."

[15] To the extent that Watson intends to argue that the trial court had a sua sponte duty to examine his ability to pay, we disagree. (See *People v. Castellano* (2019) 33 Cal.App.5th 485, 490 ["Consistent with *Dueñas*, a defendant must in the first instance contest in the trial court his or her ability to pay the fines, fees and assessments to be imposed and at a hearing present evidence of his or her inability to pay the amounts contemplated by the trial court."].)

[16] The trial court sentenced Watson in August 2019, several months *after* *Dueñas* was decided in January of that year.

## IV.

## DISPOSITION

The judgment is affirmed.


AARON, J.

WE CONCUR:


HUFFMAN, Acting P. J.


GUERRERO, J.